IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TRAVIS J. STEWART,

Plaintiff,

v.

OPINION AND ORDER

18-cv-1003-wmc

SALAM SYED and RENEE SCHUELER,

Defendants.

Travis Stewart, who is representing himself, claims that staff at Columbia Correctional Institution ("CCI") were deliberately indifferent to and negligent in treating his chronic back pain in 2017 and 2018. The court previously granted Stewart leave to proceed against defendants Salam Syed and Renee Schueler on Eighth Amendment deliberate indifference and Wisconsin negligence claims. (Dkt. #14.) Defendants have since moved for summary judgment on all of Stewart's claims. (Dkt. #47.) For the following reasons, the court will grant defendants' motion as to his Eighth Amendment claims and relinquish any supplemental jurisdiction over his remaining state-law claims.[1]

## UNDISPUTED FACTS[2]

### A. Background

At all times relevant to this case, plaintiff Travis Stewart was in the custody of the Wisconsin Department of Corrections ("DOC") at CCI. Stewart suffers from chronic foot

[1] Because of these rulings, the court need not reach defendants' alternative assertions of qualified immunity, although dismissal of plaintiff's state law claims is contingent on defendants stipulating that tolling should apply to those claims for the period in which this federal case has been pending.

[2] Unless otherwise indicated, the following facts are material and undisputed based on the parties' proposed factual findings, responses, and the evidence of record, all considered in a light most

and back pain, as well as a seizure disorder. During the same timeframe, defendant Renee Schueler was a licensed nurse in Wisconsin and the Health Services Unit ("HSU") Manager at CCI, where defendant Salam Syed was employed as a physician.

In her role as HSU Manager, Schueler was responsible for the direction and overall administrative support of the HSU. However, an HSU Manager does not ordinarily evaluate, diagnose, determine a course of treatment, prescribe medications, or even have any direct patient care responsibility for inmates; nor as an HSU Manager does Schueler have the authority to order or schedule referrals to an outside healthcare provider. In particular, an HSU Manager must defer to advanced care providers regarding appropriate medical interventions. Although HSU Manager Schueler ordinarily did not even see an inmate's Health Service Request ("HSR") or written complaints, they would occasionally be forwarded to her so she could address particular issues or send them to other staff members better suited to address the inmate's concern.

As a physician at CCI, Dr. Syed was responsible for professional medical services to inmates in accordance with DOC's standards of practice and community standards, as well as the policies and procedures set forth by DOC's Bureau of Health Services ("BHS"). Similarly, Syed reported to and was supervised by BHS's Medical Director, rather than by HSU Manager Schueler.

Finally, when an inmate at CCI is referred to an off-site medical provider, the HSU's medical office assistant or nursing staff are responsible for scheduling appointments.

favorable to plaintiff as the non-moving party. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

Ultimately, however, that timing is determined by the off-site provider's availability. After an off-site provider sees an inmate, he or she is required to complete a form issued by DOC, listing any diagnoses and treatment recommendations, and send it back with the inmate to his institution. Nurses are instructed to send any treatment recommendations to the inmate's treating doctor for review and approval. The off-site provider's dictated notes, if any exist, are typically sent via fax or email a few days to a week later. The HSU's medical assistant is responsible for flagging the off-site provider's notes and sending them to the inmate's treating doctor for review.

### B. Plaintiff's Treatment at CCI

#### 1. Assessments by Schueler and Syed

In early July of 2017, Stewart saw HSU Manager Schueler and Dr. Syed in separate visits related to foot and back pain. Stewart first told Schueler, and later Syed, that he needed "Lyrica" -- a prescription painkiller -- to treat his pain, because he felt that no other medication worked. Stewart's Lyrica prescription had been discontinued one month earlier, but he was still taking other medications to manage his pain, including Topiramate and Meloxicam. Stewart also told Syed that he was willing to take Gabapentin to treat his pain instead. Both Lyrica and Gabapentin are medications with addictive properties and are non-formulary medications requiring BHS approval. Although Syed felt that he lacked a clinical basis to start Stewart on Lyrica or Gabapentin, Stewart threatened to file a lawsuit if Syed did not do so. At a second consultation with Syed several weeks later, Stewart

again requested Lyrica, which Syed again denied for clinical reasons, and Stewart continued to threaten to sue him.

On September 10, 2017, the HSU received an HSR that Stewart sent to the "HSU Manager" (without identifying Schueler by name) regarding his pain levels and the issues he had since Syed "took his pain medication." (Dkt. #59, at 15.) More specifically, Stewart complained that Meloxicam was not helping the pain in his feet and added that he wanted to see a doctor who could address it. A non-defendant, Nurse Valerius, responded to the HSR, telling Stewart that an appointment he had with a doctor and Nursing Coordinator Lon Becher needed to be rescheduled. However, HSU Manager Schueler neither saw, nor responded, to the HSR.

Four days later, Stewart sent a series of information requests and HSRs directed to the "HSU Manager" complaining about a rescheduled psychiatric appointment, inadequate treatment of his foot pain by Dr. Syed, and untimely responses to his HSRs by HSU staff, and warning that the HSU was violating his constitutional rights.[3] (*Id.* at 16.) Although Schueler was forwarded the latter set of information requests and HSRs, she does not recall seeing or receiving them. The very next day, September 15, 2017, the HSU received another HSR from Stewart, complaining of major pain and inadequate treatment for that pain, as well as requesting medical assistance. Schueler also denies having seen that HSR.

[3] Stewart's allegations that Dr. Syed was deliberately indifferent to his foot pain and an ingrown toenail in 2016 were the subject of a separate lawsuit before this court. *See Stewart v. Syed*, No. 18-cv-003-wmc, 2020 WL 7696095 (W.D. Wis. Dec. 28, 2020).

Over the next two weeks, Stewart continued to send information requests and HSRs to the HSU: asking why he had not been removed from Dr. Syed's care or transferred to a different institution; complaining about the treatment of his foot; and reminding the HSU that he had a pending federal lawsuit against Syed. Schueler herself responded to Stewart's information request dated September 27, 2017, noting that they had recently discussed his concerns at an October 5, 2017, consultation, where she told him that she would try to arrange for a second opinion from another DOC physician. Schueler gave Stewart the same basic answer in response to his October 16, 2017, HSR.

Stewart was then seen for a second opinion from Dr. Scott Hoftiezer at Dodge Correctional Institution on November 2, 2017. Hoftiezer noted Stewart's claim that he had previously experienced some pain relief for his foot pain on Gabapentin and significant relief while on Lyrica. However, Hoftiezer also noted that Stewart had not received an adequate workup for neuropathic foot pain and recommended that he receive an electromyogram of his lower extremities. Dr. Syed received Dr. Hoftiezer's recommendations on November 13, 2017, then added orders for Stewart to receive an electromyogram of his foot and a blood sugar test to rule out diabetes.

Over the course of November, the HSU received at least three more information requests or HSRs from Stewart regarding his foot pain, seizure disorder, and alleged cancellation of medical appointments. In one of those HSRs, Stewart again threatened legal action against CCI's HSU Manager -- also without identifying Schueler by name -- and Dr. Syed, claiming that they were deliberately indifferent to his medical needs. On two occasions that month, HSU staff scheduled Stewart to see providers in response to his

HSRs. However, as HSU Manager and not part of triaging of requests by other nurses, Schueler again saw none of those HSRs.

Dr. Syed, Nurse Practitioner Kristine Lyon, and Nursing Coordinator Becher did see Stewart again for his neurological and pain complaints on November 29, 2017. Stewart complained of lower and upper back pain that he said measured an eight, on a scale of one to ten. He also reported that his legs went numb when sitting down, standing up, or lying flat, and those symptoms,-which had been ongoing for several years, were getting worse as well. Stewart further reported numbness and tingling while walking, but denied any symptoms of incontinence or historical or recent trauma. Stewart stated his concerns about taking Topiramate for his nerve pain and seizure disorder, claiming that the 75mg dosage of the drug caused him to experience sickness, involuntary spasms, and numbness, but he noted that the numbness stopped on a 150mg dosage of the drug. After this November 29 appointment, Syed discontinued Stewart's Meloxicam prescription, elevated his Topiramate dosage to 150mg, and started him on a 600mg of Ibuprofen. Because Stewart's subjective complaints were consistent with sciatica (and in order to consider any other neurological symptoms), Syed again ordered an updated electromyogram and placed him on a no-work restriction until it was completed.

On December 8, 2017, Dr. Syed next placed an order and completed an off-site service request, seeking to refer Stewart to see a neurologist at the University of Wisconsin ("UW") Hospital and to obtain an electromyogram for his sciatica pain. Two weeks later, Syed also placed an order for Stewart to receive doses of Toradol, a strong NSAID, for his

back pain, Prednisone for his inflammation, and Cyclobenzaprine to help relax his muscles and alleviate pain.

On January 2, 2018, Dr. Syed again saw Stewart for an acute exacerbation of his lower back pain. Syed informed Stewart that his electromyography appointment was still pending. After seeing Stewart on January 2, Syed also placed another order asking the scheduler to ensure that Stewart was scheduled for the electromyography that he had first ordered for him on November 29, 2017.

Two weeks later, the HSU received another HSR from Stewart in connection with his hip, back, leg, and foot pain, requesting medical attention and an MRI. After Stewart's HSR was brought to Schueler's attention as the HSU Manager, she responded that he had an appointment with Dr. Syed on January 26, 2018. The day after that HSR was received in mid-January, however, the HSU learned that Stewart had returned to work against Dr. Syed's express orders.

At Stewart's January 26 appointment with Dr. Syed, Stewart expressed concerns over his inability to work and asked that his no-work restriction be removed, hoping it might help with his back pain. Syed explained that he wanted to ensure Stewart did not suffer from any neurological problems before returning to work and potentially injuring himself. Because of Stewart's improved attitude and his request, however, Dr. Syed did remove his work restriction. Syed also provided Stewart with a six-month prescription for a 1000mg dose of Acetaminophen.

### 2. Neurology Consultation and Follow-up

On February 1, 2018, Stewart was seen by Dr. Rama Maganti, a neurologist at UW, for the consultation that Dr. Syed had ordered. After examining Stewart, Maganti felt that he was suffering from back pain that radiated to his lower left extremity, along with slightly asymmetric reflexes, but not strength. Maganti recommended that Stewart receive an MRI of his lumbar spine, along with an electromyography appointment to follow if warranted. Maganti also thought that Stewart could benefit from resuming his use of Gabapentin to address both his sciatic pain and anxiety. Accordingly, he recommended a follow-up in three months.

Stewart was seen at CCI's HSU upon returning to the institution from his appointment with Dr. Maganti. At that appointment, HSU staff told Stewart about the process that BHS care providers had to follow in order to make changes to the orders on his medical file. Later that day, Dr. Syed referred Stewart back to the UW neurology department for a three-month follow-up after Stewart's electroencephalogram ("EEG") for seizures. That EEG was ultimately completed on March 15, 2018.

On February 5, 2018, Dr. Syed saw Stewart for concerns including hypertension, lipids, seizures, and pain control. In accordance with Dr. Maganti's recommendations, Stewart in particular wanted to have his pain managed again with Gabapentin. However, Syed explained that the primary purpose of Stewart's visit with Maganti was to address his neurological concerns, not pain management. Syed further explained that he was not convinced Stewart required Gabapentin, and it was ultimately his clinical decision

weighing Stewart's medical needs and penological concerns introducing that drug or other drugs with addictive properties into CCI.

Over the next month and a half, Stewart submitted a series of HSRs to the HSU directed to Dr. Syed, the HSU Manager, Nursing Coordinator Becher, or some combination of the three, complaining of pain in his back and legs, stomach pain, chest pain, heart pain, spine pain, and pain more generally. In each case, HSU staff responded by noting that Stewart had either: (1) been scheduled with a doctor or nurse to discuss his concerns; (2) already discussed his concerns with HSU staff; or (3) not received the necessary approvals for the tests that had been recommended by outside providers, including Dr. Maganti.

**3. Ongoing Disagreements with CCI Staff**

Dr. Syed saw Stewart again on March 19, 2018 for Stewart's chest pain, elevated blood pressure, and sciatica pain. Despite Syed's efforts to address Stewart's chest pain and elevated blood pressure, Stewart did not respond to Syed's advice regarding blood pressure medication, nor was he willing to let Syed address his other medical concerns. After Stewart became argumentative, Dr. Syed then asked security staff to take him out of the examining room.

Stewart was next seen by another HSU nurse on April 9, 2018, in response to a complaint that his sciatica and leg pain had gotten worse. He was given ice and Ibuprofen, and the nurse promised to seek an update from Dr. Syed regarding Dr. Maganti's recommendation that Stewart resume using Gabapentin. However, Syed responded to the nurse's note two days later, again noting that Stewart was sent to Maganti in connection

with his seizures, *not* pain management, and raising his concern that Stewart was attempting to use his appointment with Maganti to obtain medication that was not clinically necessary or on BHS's formulary. Syed also observed that Stewart had many previous scans that had come back negative, adding that he also did not believe an MRI was medically necessary, and felt that ordering one would be a waste of resources.[4]

On or about May 1, 2018, Stewart submitted three more information requests to the HSU in connection with Dr. Syed's care. HSU Manager Schueler responded to Stewart, informing him that they had met about his concerns, and she would let him know when she heard anything from Dr. Hoftiezer regarding a second opinion. Stewart subsequently went on a nine-day hunger strike. At a May 2 consultation with an HSU nurse, Stewart complained that his medical needs were not being addressed and was advised to keep taking his medication, exercise, and submit a form requesting a psychiatry consult for his anxiety. Schueler also met with Stewart the next day to discuss the concerns he had with his medical care.

Several days later, Stewart sent an information request directed to HSU Manager Schueler, along with a letter to Dr. Hoftiezer regarding Stewart's concerns with the treatment he was receiving from Dr. Syed. In the information request, Stewart asked Schueler to forward a letter to Dr. Hoftiezer that she had asked him to write. Schueler responded the next day, informing Stewart that she had forwarded the letter to Hoftiezer

[4] The parties cite a handwritten progress note that Dr. Syed wrote after he saw Stewart on April 11, 2018, for the fact that "he did [not] believe an MRI was medically necessary and that it would be a waste of resources." (Dkt. #59, at 39 and Dkt. #51-1, at 27.) Although Dr. Syed's handwriting is difficult to read, he clearly believed an MRI was *not* medically necessary based on the parties' briefing and the context surrounding Dr. Syed's note.

and would inform him of any decisions regarding his chart review for a second opinion. Schueler not only sent Stewart's letter to Dr. Hoftiezer, but also to the BHS Medical Director, Dr. Paul Bekx.

On May 7, 2018 -- the same day that Stewart sent his information request to Schueler -- Stewart saw Dr. Syed for an assessment of his hunger strike, which Stewart said he was undertaking to ensure certain medical tests were administered. Syed told Stewart that he had a scheduled electromyography appointment, as recommended by Hoftiezer, but that he would not order any additional tests at the time because none were medically necessary.

The following week, however, Dr. Syed apparently reconsidered, placing a referral and order for Stewart to receive an MRI of his lumbar spine at the UW Hospital's radiology department at Dr. Bekx's recommendation. Bekx also noted that Stewart's MRI should be completed before the electromyography. As HSU Manager, Schueler subsequently sent Stewart a memo stating that his records had been reviewed as they had discussed, an MRI was scheduled, and any additional treatment or testing could be ordered based on the results.

**4. Stewart's Wait for Medical Testing**

Stewart went on another hunger strike from June 1 through June 5, 2018. During that hunger strike, defendant Schueler and Assistant Health Service Manager Hodge were informed by CCI's Institution Complaint Examiner ("ICE") that Stewart had filed an inmate complaint alleging that Dr. Syed was not providing medication that he believed his condition needed, leaving him in pain. However, Schueler later told the ICE that she had

met with Stewart about the concerns in his complaint, and later spoke with Dr. Bekx about them. Schueler added that Stewart had already been scheduled to receive an MRI. Finally, she advised ICE that Dr. Syed had seen Stewart again on June 6, 2018, and prescribed him a ten-day supply of Tramadol (a narcotic) for his pain.

Nevertheless, Stewart went on a third hunger strike beginning on June 20, 2018. Stewart was then seen by a nurse practitioner for chronic pain management. He reported to her that: Ibuprofen was not working for his pain; his pain was not being addressed; and he was on a hunger strike. Although the nurse practitioner was unable to prescribe additional Tramadol, as Stewart had requested, she placed an order for him to receive capsaicin cream, as well as an electromyogram of his left sciatic nerve. That same day, Dr. Syed referred Stewart to the UW Hospital for an electromyography appointment.

Stewart was next seen by Schueler on July 5, 2018. She informed him that his MRI had been scheduled, and that HSU did not have control over openings at off-site clinics. Even so, she also noted that an appointment with a doctor was scheduled for July 11. However, Stewart subsequently began a fourth hunger strike on July 11, at which point he saw Schueler once again.

On or about July 12, 2018, Stewart went to an off-site appointment with a neurologist at the UW Hospital for his seizure disorder. The neurologist recommended EEG monitoring at the hospital, an MRI for his left spine, and a 600mg daily dose of Gabapentin. Upon returning to CCI, Stewart was seen by an HSU nurse. At that consultation, Stewart was emotional and directed his anger towards Dr. Syed and the care

he was receiving from him. On July 17, 2018, however, Schueler and Stewart subsequently spoke, and Stewart informed her that he was feeling better.

**5. Stewart's Additional Medical Testing and Results**

Stewart underwent an MRI at the UW Hospital on July 19, 2018. The results from that MRI were then compared to an MRI that Stewart had undergone on August 8, 2012, and the findings were substantially normal or otherwise unchanged.

Over the next two weeks, Stewart sent HSRs to Schueler, Syed, or the HSU regarding follow-ups from the MRI or his ongoing pain. Neither Schueler nor Syed saw any of the HSRs directed to them. However, Stewart was scheduled to see a medical provider in response to an HSR dated July 23, 2018, citing pain in his lower back and legs. Separately, Stewart submitted a letter regarding his pain and Dr. Syed's medical treatment to Schueler on July 30. Schueler responded that same day, telling Stewart that if he wanted to be seen in sick call, he needed to submit an HSR. This apparently prompted Stewart's fifth hunger strike in early August.

Stewart was also seen at the UW Hospital for an electromyogram of his lower left extremity on August 9, 2018. However, that testing also came back normal, with no electrodiagnostic evidence of radiculopathy, plexopathy, or neuropathy. On August 20, Stewart sent a letter to Schueler again complaining about his "inadequate and improper medical treatment." (Dkt. #59, at 52.) Once again, Schueler neither saw nor responded to this letter. In fact, Schueler stopped working as the HSU Manager at CCI shortly after. On that same day, Dr. Syed referred Stewart to the UW spine clinic for evaluation and treatment of his chronic back pain.

Dr. Syed next saw Stewart on September 4, 2018, for a follow-up on syncopal episodes, seizures, pain medications, and Stewart's hunger strike. At that time, Stewart complained of constant burning back pain along the length of his spine for which he was on NSAIDs and Tylenol. Syed placed an additional order for Stewart to receive a 500mg dose of Tylenol twice daily until March 5, 2019. Stewart went on another hunger strike beginning the next day. However, on September 17, 2018, Stewart was scheduled for a surgical evaluation at UW Hospital to evaluate his neck, lower back, and leg pain.

On October 10, 2018, Dr. Houtan Ali Taba, a spine surgeon at UW Hospital, reviewed Stewart's X-ray, MRI, and electromyography results. He diagnosed Stewart with a grade 1 isthmic spondylolisthesis.[5] In his report, Dr. Taba also noted that Stewart's electromyography "show[ed] no apparent nerve compression or neuropathy to explain his symptoms" and expressed his opinion that there was "[not] much to offer outside of therapy for treatment." Dr. Taba added that Stewart "should attempt a course of core strengthening in therapy," and he felt that there was "[n]o apparent role for spine surgical evaluation." (Dkt. #59, at 54.) Dr. Syed reviewed the MRI results himself two days later, noting that Stewart did not need any additional interventions and should continue to exercise.

[5] Isthmic spondylolisthesis is a spinal condition where a vertebra slips forward over the one below it because of a fracture in the bone connecting the two vertebrae along the back of the spine. Although a grade 1 manifestation of isthmic spondylolisthesis is the mildest form of the condition, the causes can vary; it is often linked to a failure of proper bone development, accumulated physical stress to the spine, or certain forms of exercise. *Spondylolisthesis*, Cleveland Clinic (August 15, 2024), https://my.clevelandclinic.org/health/diseases/10302-spondylolisthesis.

Stewart next had a nursing visit regarding acute back pain on November 8, 2018. He requested to be seen by a specialist and undergo further studies. Instead, he was educated on stretching exercises and scheduled to see a physician, and an order for Ibuprofen was placed through February 8, 2019. Stewart was also scheduled to report to the HSU for a nurse visit on November 20, 2018 to discuss his chronic back pain, but he refused to be seen, at least at that time. Stewart was willing to be seen by another nurse practitioner on November 30, 2018, during which he reported a constant, burning back pain. The nurse practitioner placed an order for Stewart to receive a three-month course of 600mg Gabapentin for his seizure disorder.

## OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). At summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017). Here, plaintiff was granted leave to proceed against defendants Syed and Schueler on a set of Eighth Amendment deliberate indifference and state-law negligence claims. Defendants seek summary judgment on all of plaintiff's claims. The court will

begin with plaintiff's federal constitutional claims under the Eighth Amendment before turning to his state negligence claims.

## I. Eighth Amendment Claims

The Eighth Amendment gives prisoners the right to receive adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements: (1) an objectively serious medical need; and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). Defendants contend that plaintiff cannot prove either the objective or subjective prongs of that test. (Dkt. #48, at 26.) The court analyzes each element below.

### A. Serious Medical Need

A medical need is "serious" if it: so obviously requires treatment that even a lay person could recognize the need for medical attention; carries risk of permanent serious impairment if left untreated; results in needless pain and suffering; *or* significantly affects an individual's daily activities. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241-42 (7th Cir. 2021); *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997).

In defendants' telling, plaintiff cannot demonstrate that he had an objectively serious medical condition because the results of his X-ray, MRI, and electromyography were reviewed by an independent medical provider who concluded that plaintiff suffered from a grade 1 isthmic spondylolisthesis that lacked stenosis, nerve root compression, or

neuropathy that would explain his symptoms. Defendants also point to their impressions that plaintiff seemed to be lacking outward signs of distress and refused to follow his work restriction.

At summary judgment, however, the court must draw all inferences in favor of the non-movant, and in doing so, a reasonable jury *could* find that plaintiff's ongoing reports of extreme, debilitating back pain constituted a serious medical need during the period he was being treated by defendants. *See Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 681-82 (7th Cir. 2012) (allegations of chronic pain are sufficiently serious to support an Eighth Amendment claim); *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) (same).

**B. Deliberate Indifference**

"Deliberate indifference" means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it, which is a decidedly high standard by itself. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Thus, acts of deliberate indifference require more than negligence, or even gross negligence, but require something less than purposeful acts. *Farmer v. Brennan*, 511 U.S. 825, 835-36 (1994). The threshold for deliberate indifference is met where: (1) "the official knows of and disregards an excessive risk to inmate health or safety"; or (2) "the official [is] both [] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and he or she draws that inference yet deliberately fails to take reasonable steps to avoid it. *Id.* at 837.

In the medical context, deliberate indifference may be inferred when the defendant's conduct is "blatantly inappropriate," *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996), or "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). In other words, "[a] constitutional violation exists only if no minimally competent professional would have so responded under those circumstances." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021) (internal quotations omitted). Thus, a plaintiff asserting a medical-care claim under the Eighth Amendment must prove four things: (1) the prisoner needed medical treatment; (2) the defendant knew that the prisoner needed medical treatment; (3) the defendant consciously refused to take reasonable steps to provide the needed treatment; and (4) the defendant's action or inaction harmed the plaintiff. Federal Civil Jury Instructions of the Seventh Circuit § 7.17 (2017); *Hunter v. Mueske*, 73 F.4th 561, 565 (7th Cir. 2023). The court is to look at the "totality of [the prisoner's] medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

To prevail on his deliberate indifference claims, plaintiff must also show that each defendant's *personal* actions caused his injury. *See Herzog v. Vill. of Winnetka*, 309 F.3d 1041, 1044 (7th Cir. 2002) ("[T]he ordinary rules of tort causation apply to constitutional tort suits."). While causation is normally a question for the jury to decide, *Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010), plaintiff must still show how each of the defendants was personally involved in depriving him of or delaying necessary treatment. *Kuhn v. Goodlow*, 678 F.3d 552, 555-56 (7th Cir. 2012). Likewise, a defendant cannot be held

liable under the Eighth Amendment "if the remedial step was not within [his or her] power." *Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012). Thus, the court analyzes plaintiff's proof of Dr. Syed's and HSU Manager Schueler's deliberate indifference separately.

**1. Dr. Syed**

Plaintiff claims that Dr. Syed was deliberately indifferent to his back and knee pain by: (1) prescribing him certain pain medications despite knowing that they were ineffective; and (2) denying him an electromyogram or MRI and otherwise delaying his treatment. However, the evidence of record proves the contrary.

*First*, even if plaintiff disagreed with defendant Syed's choice of medications to treat his back pain, he cannot prove Syed acted with deliberate indifference to that pain given the undisputed history of his attempts to address his pain *and* repeated referrals to specialists who were equally unable to point to a cause or remedy for his pain. In fairness to plaintiff, a prison official's decision to persist in a course of treatment known to be ineffective can constitute a departure from minimally competent judgment. *Petties*, 836 F.3d at 729. However, the Eighth Amendment does *not* give a prisoner the right to specific treatment or a medical provider of his choosing on demand. *Id.* at 730. Further, medical professionals are "entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)). That is particularly the case with decisions involving pain medications in an institutional setting. *E.g.*, *Burton v. Downey*, 805 F.3d 776, 785-86 (7th

Cir. 2015) (doctor's refusal to prescribe narcotic did not violate detainee's constitutional rights despite another doctor's prescription for it); *see also Snipes*, 95 F.3d at 592 ("Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations.").

Plaintiff's disagreements with Dr. Syed's medical decisions do not create a triable issue where the record plainly shows that: (1) plaintiff was consistently administered pain medications in response to his complaints of back pain; (2) Syed acknowledged plaintiff's complaints regarding back pain, even if disagreeing on the proper course of treatment; and (3) Syed consistently exercised medical judgment in prescribing or withholding certain forms of medication to treat plaintiff's pain -- in particular, the narcotic medications that plaintiff was requesting. Even if Lyrica or Gabapentin would have been *more* effective in treating plaintiff's back pain, there is no basis for a reasonable jury to find on this record that Dr. Syed acted unreasonably in prescribing pain medications with fewer side effects or addictive qualities, particularly in a prison setting where such drugs are regularly abused and can cause disruptions. At minimum, Dr. Syed was exercising his medical judgment in trying other pain medications in light of the unique issues in administering narcotics in a prison. *Burton*, 805 F.3d at 785-86.

*Second*, Dr. Syed's initial unwillingness to order an electromyogram or MRI for defendant may have been at odds with determinations made by other physicians inside and outside DOC, but it, too, did not rise to the level of deliberate indifference. In particular, the fact that another medical provider reached a different conclusion about what treatment or testing to provide plaintiff -- as Drs. Hoftiezer, Bekx, and Maganti did

here -- is not, on its own, evidence of deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Moreover, the record shows that Syed implemented his colleagues' recommendations that Stewart be seen for electromyography and MRI appointments shortly after learning of them.

Plaintiff takes particular issue with the time that elapsed between his requests for electromyography and MRI appointments, Dr. Syed placing orders for those appointments, and when the testing ultimately took place. Certainly, an "inexplicable delay" that exacerbates a prisoner's medical condition or unnecessarily prolongs suffering can show deliberate indifference. *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (quotation marks omitted). "[E]ven brief, unexplained delays in treatment may constitute deliberate indifference." *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (quotation marks omitted). However, even if Syed occasionally took several days to place an off-site service request for plaintiff's electromyography or an order for his MRI, the evidence of record also shows that: (1) he placed multiple orders for the electromyography appointment and checked up on whether it had been scheduled; and (2) he was not directly responsible for coordinating with the off-site provider in any case. Thus, a reasonable jury could not infer that defendant Syed was deliberately indifferent on this record. *See Forstner v. Daley*, 62 F. App'x 704, 706 (7th Cir. 2003) (26-month delay between injury and surgery, caused by transfer of inmate and scheduling appointments not deliberate indifference); *Zimmerman v. Prison Health Servs., Inc.*, 36 F. App'x 202, 203 (7th Cir. 2002) (delay due to "bureaucratic obstacles" and "scheduling difficulties" is not deliberate indifference).

In circumstances where medical care is delayed, the Seventh Circuit has "required that the plaintiff present 'verifying medical evidence' that the delay, and not the underlying condition, caused some harm." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (quoting *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013)); *see also Petties*, 836 F.3d at 730-31 (a delay in treatment only constitutes deliberate indifference where a plaintiff presents independent evidence that the delay exacerbated an injury). Plaintiff has not done so here; indeed, the medical evidence of record -- in particular, the evaluation of his testing results by Dr. Taba at UW -- suggests that physical therapy was the *only* remedy for plaintiff's condition, and that any surgical intervention would have been ineffective. Moreover, plaintiff may well have aggravated his condition by insisting that his work restriction be removed. Because no reasonable jury could conclude that Dr. Syed acted with deliberate indifference to plaintiff's complaints of pain, he is entitled to summary judgment on plaintiff's Eighth Amendment claim against him.

**2. HSU Manager Schueler**

Plaintiff separately contends that HSU Manager Schueler acted with deliberate indifference to his pain by: (1) failing to intervene when Dr. Syed denied him an MRI; (2) needlessly delaying his medical treatment and failing to expedite his receipt of an MRI; and (3) failing to take any steps to question whether plaintiff's pain management plan should be adjusted in light of plaintiff's complaints. However, the evidence fails to support any of these contentions.

*First*, plaintiff has not identified any duty she had as an HSU Manager to intervene in his medical treatment. Although a prison official who knows an inmate is receiving

inadequate medical care but "fail[s] to exercise his or her authority to intervene on [the inmate's] behalf to rectify the situation" *can* be liable under the Eighth Amendment, the record lacks any indication that plaintiff's medical care was inadequate in the first place. *Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015). In fact, plaintiff's requests for medical attention for his back pain -- whether in the form of HSRs, information requests, or letters to Schueler or her HSU colleagues -- were promptly answered in a responsive manner, even if Stewart did not agree with the course of treatment provided. Moreover, the evidence shows that rather than meeting his complaints with deliberate indifference on the few occasions when plaintiff's complaints were brought to her attention, Schueler followed up as HSU Manager by discussing plaintiff's medical concerns extensively with Drs. Bekx and Hoftiezer, as well as with Nursing Coordinator Becher, at various times relevant to plaintiff's claims.

*Second*, Schueler cannot be held liable under the Eighth Amendment "if the remedial step[s]" that plaintiff sought were "not within [her] power." *Miller*, 698 F.3d at 962. As the evidence shows here, in her capacity as an HSU Manager, Schueler generally did *not* play any role in triaging patients' needs, directly treating patients, ordering care, or prescribing medications. (Dkt. #59, at 4-5.) Although it is clear that Schueler *did* play a more direct role in addressing plaintiff's concerns about the treatment he was receiving than she may have for most other inmates, it is also undisputed that HSU Managers lacked the authority to refer patients to off-site providers or otherwise override the treatment decisions of advanced care providers, such as Dr. Syed. (Dkt. #59, at 5.) In any event, plaintiff has not presented any evidence suggesting that Schueler delayed his medical

treatment *or* could somehow have expedited the scheduling of his off-site medical appointments.

*Third*, plaintiff is not a medical professional, so he "is not competent to diagnose himself, and he has no right to choose his own treatment." *Lloyd v. Moats*, 721 F. App'x 490, 495 (7th Cir. 2017). Simply because plaintiff believed that he should have been given certain pain medications or sent for medical imaging does not mean that a failure to receive them constitutes deliberate indifference on the part of Schueler, much less that she was in a position to second-guess Dr. Syed's or another direct provider's medical judgment. To the contrary, prison nurses are entitled to rely on objectively reasonable medical decisions by an inmate's treating physician. *McCann v. Ogle Cnty.*, 909 F.3d 881, 887 (7th Cir. 2018).

Taken together, no reasonable jury could find that HSU Manager Schueler was deliberately indifferent to plaintiff's medical needs, particularly when: (1) plaintiff was already receiving direct care for the conditions he complained about; and (2) Schueler lacked the authority to override or take other remedial action in the absence of manifest indifference by others. Accordingly, summary judgment will be entered as to plaintiff's Eighth Amendment claims against Schueler as well.

## II. Exercise of Supplemental Jurisdiction over Plaintiff's State-Law Negligence Claims

That leaves plaintiff's state-law negligence claims against both defendants. While the court may exercise supplemental jurisdiction over these claims, 28 U.S.C. §1367(a), the court declines to do so here given that plaintiff's related, federal claims are being

dismissed before trial, and as explained above, the court has not considered the merits of those state-law claims under a different evidentiary standard. 28 U.S.C. § 1367(c)(3). In deciding whether to exercise supplemental jurisdiction, a federal court "should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Here, exercising jurisdiction over plaintiff's state-law claims does not serve judicial efficiency, nor have the parties asked the court to retain jurisdiction over them if the federal claims are dismissed. Accordingly, plaintiff's state-law claims will be dismissed without prejudice to him pursuing them in Wisconsin state court, subject to defendants agreeing to waive any application of the relevant statute of limitations to plaintiff's negligence claims without excluding the six years during which his claims were pending in this case.[6]

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #47) is GRANTED IN PART and judgment shall be entered against plaintiff Stewart on his Eighth Amendment claims.

2) Subject to defendants timely filing the waiver set forth above, the court will relinquish jurisdiction over plaintiff's state-law claims against defendants Syed and Schueler, which will be dismissed without prejudice.

[6] Defendants may have ten days to indicate in writing their agreement to waive dismissal of any subsequent state lawsuit for negligence brought by plaintiff on statute of limitations grounds that depends in whole or in part on counting the period his state law claims were pending in this federal lawsuit. Otherwise, the court will take up these claims on summary judgment promptly as a matter of fundamental fairness.

3) If that waiver is timely filed, the clerk of court is further directed to enter final judgment accordingly and close this case. If not, the clerk should promptly notify chambers.

Entered this 14th day of November, 2024.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge